

**Entered on Docket**
**January 12, 2006**

_Bruce A. Markell_
_____
**Hon. Bruce A. Markell**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

* * * * * *

In re:                                                    )
                                                         )    Case No.: BK-S-05-17401-BAM
                                                         )    Chapter 7
STEVEN C. KANE dba IDEAL OFFICE       )
INTERIORS, INC. and LINDA SIEGEL       )
KANE dba OFFICE INTERIORS, INC.,        )
                                                         )    Date:   November 16, 2005
                    Debtor.                           )    Time: 2:30 p.m.
                                                         )
_____ )

**OPINION SUSTAINING TRUSTEE'S OBJECTION TO DEBTORS'**
**HOMESTEAD EXEMPTION**

The debtors in this case, Steven and Linda Siegel Kane, filed a chapter 7

bankruptcy on July 29, 2005.  In their schedules, they listed a home in Las Vegas worth

$318,000, and noted that it was subject to a $158,000 mortgage, leaving them some

$160,000 in equity.  Their current  schedules claim a homestead exemption in the entire

amount of this equity under Nevada law.[1]

The Kanes' bankruptcy trustee, James F. Lisowski, Sr., objected to this claim of

exemption.  He asserts that Section 522(p) of the Bankruptcy Code, a relatively new

---

[1]The Nevada homestead exemption is currently $350,000.  It is contained in NEV. REV.
STAT. §§ 115.010.2 and 21.090.1(*l*).  Effective October 1, 2003, the Nevada legislature increased
the exemption from $125,000 to $200,000, 2003 NEV. STAT. Ch. 201 (S.B. 70) § 1, and, effective
July 1, 2005, increased it again from $200,000 to $350,000, 2005 NEV. STAT. Ch. 290 (S.B. 173) §
1.

provision of the Code added by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005,[2] limits the exemption to $125,000. Specifically, the trustee asserts that Section 522(p) caps a debtor's homestead exemption at $125,000 – regardless of any higher exemption adopted by state law, such as in Nevada – if the debtor had not owned the homestead or a predecessor homestead in the same state for at least 1,215 days before filing bankruptcy.[3]

The debtors did not meet this ownership requirement. They lived in California from February 1997 to December 2004. At the first meeting of creditors held under Section 341(a), they testified that they had purchased their Nevada property at the beginning of 2005. They therefore did not own their Nevada homestead (or a predecessor homestead in Nevada) for the 1,215-day period required by Section 522(p). This is the crux of the trustee's objection.[4]

The actual wording of Section 522(p), however, creates a serious interpretive problem. It says that the $125,000 cap comes into effect "as a result of [a debtor's] electing . . . to exempt property under State or local law . . . ." 11 U.S.C. § 522(p). The problem is with the use of the term "electing" as the triggering event: as permitted by Section

---

[2]Pub. L. No. 109-8, § 322(a), 119 Stat. 23, 74-75 (2005).

[3]Most of the new bankruptcy law became effective on October 17, 2005 – 180 days after being signed by the President – but Section 522(p) took effect when the President signed the bill on April 20, 2005. *Id.*, § 1501(b)(2), 119 Stat. at 194. It therefore applies to the debtors in this case.

[4]Section 522(b)(3)(A), also added by the 2005 legislation, would normally require the Kanes to have resided in Nevada for at least 730 days before the filing of their petition in order to claim Nevada exemptions. But unlike Section 522(p), Section 522(b)(3) was not immediately effective, and its effective date, like most of the provisions of the 2005 legislation, was 180 days after enactment, or October 17, 2005. Pub. L. No. 109-8, § 1501(a), (b)(1), 119 Stat. 23, 194 (2005). As a result, the Kanes are not precluded from claiming Nevada exemptions in this case.

2

522(b)(2), more than two-thirds of the states, including Nevada, have opted-out of the federal exemption scheme.  *See* NEV. REV. STAT. § 21.090.3.[5]  In this context, "opting out" means that residents of those states can use only state and nonbankruptcy exemptions; put another way, the exemptions found in Section 522(d) of the Bankruptcy Code are not available to residents in "opt-out" states such as Nevada.  In such "opt-out" states, then, debtors cannot and do not "elect" anything.  Since there is no election, nothing happens as the "result of electing."

Does this mean, as the Kanes argue, that the 1,215-day ownership requirement of Section 522(p) does not apply in Nevada and that the Kanes' homestead exemption is therefore not subject to the $125,000 cap?[6]  In the short time that Section 522(p) has been

---

[5]The text of this statute reads: "Any exemptions specified in subsection (d) of section 522 of the Bankruptcy Act of 1978, 11 U.S.C. § 522(d), do not apply to property owned by a resident of this State unless conferred also by subsection 1, as limited by subsection 2."

[6]In their initial briefs, the debtors argued that since Section 522(p)'s cap would reduce the exemption granted by state law, it should be struck down as an unconstitutional taking in violation of the Fifth Amendment.  Courts have typically rejected similar claims.  *See, e.g.*, *In re* Thompson, 867 F.2d 416 (7th Cir. 1989) (use of Section 522(f) to strip lien off "tools of the trade" not unconstitutional taking even if it incorporated state definition of such tools at variance with similar federal definition); Coan v. Bernier (*In re* Bernier), 176 B.R. 976 (Bankr. D. Conn. 1995) (ability of trustee to see non-debtor's interest in homestead owned in common with debtor not an unconstitutional taking).

The court rejects the debtors' argument for several reasons: First, there is no constitutional right to file for bankruptcy.  *Cf.* Thomas Kelch, *The Mythology of Waivers of Bankruptcy Privileges*, 31 IND. L. REV. 897, 900 (1998) ("Not only is there no constitutional right to file bankruptcy, but Congress need not even create a bankruptcy law"); United States v. Kras, 409 U.S. 434, 446 (1973) ("There is no constitutional right to obtain a discharge of one's debts in bankruptcy," and a debtor who cannot pay the filing fee is not entitled to access to bankruptcy protection).  As a result, due process is satisfied when Congress enacts law in accordance with its plenary power under Article I, Section 8 of the Constitution to establish "uniform Laws on the subject of Bankruptcies throughout the United States."

Second, state law exemptions must fall when in conflict with federal law; that is the teaching of Article VI of the Constitution, the Supremacy Clause.  *See, e.g.* 26 U.S.C. § 6334(a);

3

1    on the books, five courts have already grappled with this puzzling provision, and they have

2    reached divergent results.

3    Three of the cases involve essentially the same fact pattern that is present here:

4    debtors who did not own their homestead for at least 1,215 days in a state that opted out of

5    the federal exemption scheme, thereby making it impossible for the debtor to "elect"

6    between state and federal exemptions.  Judge Mark in Florida and my colleague, Judge

7    Riegle in Nevada, conclude that under these facts, the homestead exemption is capped,

8    while Judge Haines in Arizona says that it isn't because the debtor made no "election."  In

9    the fourth case, Judge Friedman in Florida considered the rollover of property within the

10    same state and found no cap, and in the fifth case, Judge Hale in Texas held that the

11    debtors' increased equity in their homestead during the 1,215 days before filing was not

12    subject to the cap.

13    Judge Mark found the text of Section 522(p) ambiguous, so he looked to its

14    legislative history, which clearly shows that Congress intended for there to be a cap for all

15    debtors.  He imposed one, even though the debtor had no choice between state and federal

16    exemptions.  *In re* Kaplan, 331 B.R. 483 (Bankr. S.D. Fla. 2005).  Judge Riegle found that

17    the election requirement of 522(p) was satisfied when the debtor made a decision to claim a

18

---

19    Drye v. United States, 528 U.S. 49, 52 (1999) ("state law is inoperative to prevent the attachment

20    of liens created by federal statute in favor of the United States.").  Thus, there is no reason to
     believe that homestead protections recognized under state law must be carried into the federal

21    bankruptcy code.  Indeed, the Bankruptcy Act of 1841 adopted uniform federal exemptions, capped
     at $300, and did not incorporate state law.  Bankruptcy Act of 1841, ch. 9, § 4, 5 Stat. 440, 443-44

22    (1841).

23    Finally, President Bush signed the 2005 changes to the bankruptcy law into law on April 20,
     2005, and the Kanes had or could have had full knowledge of the provisions of the law when they

24    filed for bankruptcy in July. To their credit, the debtors did not renew or expand on this argument
     in their supplemental briefs.

25
     4

homestead exemption.  That is, a debtor elects by simply claiming an exemption and "electing" not to claim a homestead.  She believes this to be the case even though a Nevada debtor has no choice between the federal and state exemptions.  Because she finds an election, she finds that the cap applies.  *In re* Virissimo, 332 B.R. 201 (Bankr. D. Nev. 2005).

On the other hand, Judge Haines said that though the result was odd, the text of the statute is clear, and he was required to apply it unless and until Congress changed it (which, he suggested, Congress should do).  In the meantime, he said, if the debtor made no election between state and federal exemptions, there is no cap. *In re* McNabb, 326 B.R. 785 (Bankr. D. Ariz. 2005).

Judge Friedman in Florida thought that there should be a cap, but inasmuch as the debtor had rolled over a previous homestead property, he applied the "safe harbor" of Section 522(p)(2)(B) which allows the homestead exemption to remain uncapped if a debtor's new homestead is simply a continuation of the debtor's residence in the state.  *In re* Wayrynen, 332 B.R. 479 (Bankr. S.D. Fla. 2005).  Finally, Judge Hale held that for debtors who acquired their homestead more than 1,215 days before filing, the increase in their equity during the 1,215 days before filing was not subject to the cap.  *In re* Blair, 334 B.R. 374  (Bankr. N.D. Tex. 2005).

This court concurs with Judges Mark and Riegle – the cap applies to all debtors who do not satisfy the 1,215-day rule – but for different reasons than either of them advanced.  Whether the text is ambiguous or not, it is still possible to consider and implement what Congress unambiguously intended and to overcome the drafters'

unfortunate choice of words.[7]

## Closing the "Mansion Loophole"

Section 522(p) was intended to address the well-documented and often-expressed concern by members of Congress about the so-called "mansion loophole" by which wealthy individuals could shield millions of dollars from creditors by filing bankruptcy after converting nonexempt assets into expensive and exempt homesteads in one of the handful of states that have unlimited homestead exemptions – usually Florida and occasionally Texas. *See, e.g.*, Havoco of Am., Ltd. v. Hill, 790 So.2d 1018, 1028 (Fla. 2001) ("The transfer of nonexempt assets into an exempt homestead with the intent to hinder, delay, or defraud creditors is not one of the three exceptions to the homestead exemption provided in article X, section 4 [of the Florida Constitution]. Nor can we reasonably extend our equitable lien jurisprudence to except such conduct from the exemption's protection.").[8]

The history of Section 522(p) unequivocally demonstrates that Congress believed that the 2005 legislation closed that loophole, which had repeatedly been discussed and been a concern for nearly a decade. In its report in 1997, the National Bankruptcy Review

_____

[7]Section 522(p) is one of many examples of poor drafting in the new bankruptcy law, which Professor Todd Zywicki assured the Senate Judiciary Committee was "fine as it is," adding, "There is no word that I would change in this particular piece of legislation." SEN. JUD. COMMITTEE, *Hearing on S. 256: Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*, 109th Cong., unofficial transcript (March 10, 2005).

[8]The unlimited homestead exemption was a concern as early as the first American bankruptcy law, in 1800, although the concern then was that the federal law would affect the homestead of Jeffersonian plantation owners. *See* BRUCE H. MANN, REPUBLIC OF DEBTORS: BANKRUPTCY IN THE AGE OF AMERICAN INDEPENDENCE 196-98 (2002). It also is fairly unique; as noted by Professor Charles Tabb, the concept of an unlimited exemption "is unimaginable in the rest of the world." Charles J. Tabb, *Lessons from the Globalization of Consumer Bankruptcy*, 30 LAW & SOC. INQUIRY 763, 777 (2005).

Commission, which Congress had created in 1994 to review the operation of the bankruptcy system and recommend changes, identified the problem and found:

> In deferring to state law exemptions, the current system . . . multiplies the opportunities for forum shopping and prebankruptcy asset conversion. . . . Unlimited homesteads have led to national ridicule and the efforts of some less needy and better represented families to find literal and figurative shelter in generous states.[9]

In the years since the commission's report, during which bankruptcy bills were debated yearly,[10] the mansion loophole was always on legislators' minds.[11]  *See* Melissa B.

---

[9] NAT'L BANKR. REV. COMM'N, BANKRUPTCY: THE NEXT TWENTY YEARS, NATIONAL BANKRUPTCY REVIEW COMMISSION FINAL REPORT, OCTOBER 20, 1997, at 124 (footnotes omitted).

[10] Indeed, President Clinton "pocket vetoed" bankruptcy reform in 2000 at least in part because it did not close the mansion loophole.  *See Memorandum of Disapproval for Bankruptcy Reform Legislation*, 3 PUB. PAPERS 2730, 2730-31 (Dec. 19, 2000), *reprinted in* 2000 U.S.C.C.A.N. D85  (opposing the bill because "the loophole for the wealthy is fundamentally unfair and must be closed.").

[11] *See, e.g.*, the statement by twelve members of Congress that was included as Additional Views in the House Report on the proposed Bankruptcy Reform Act of 1999:

> [W]e should start with individuals like Marvin Warner, a former ambassador to Switzerland and the owner of a failed Ohio Savings & Loan, who paid off only a fraction of $300 million in bankruptcy claims while keeping his multi-million-dollar horse ranch near Ocala, Florida.
> Or Martin A. Siegel, a former Wall Street investment banker convicted of insider trading. While facing a $2.75 billion civil suit, he bought a $3.25 million, 7,000-square-foot beachfront home in Ponte Vedra Beach.
> Or former baseball commissioner Bowie Kuhn, whose Manhattan law firm went into bankruptcy. After creditors seized his weekend house in the Hamptons and were about to attach his $1.2 million home in Ridgewood, New Jersey, Kuhn acquired a million-dollar house in Florida with five bedrooms and five baths.
> Or Dr. Carlos Garcia-Rivera, a Miami physician with no malpractice insurance, who was named in four separate malpractice actions, filed for bankruptcy protection, and kept a $500,000 home with a 100-foot swimming pool.
> Or the Dallas developer, Talmadge Wayne Tinsley, who filed under chapter 7 after incurring $60 million in debts. Tinsley objected to the Texas law that permitted him to keep only one acre of his $3.5 million, 3.1-acre magnolia-lined

7

Jacoby, *Negotiating Bankruptcy Legislation Through the News Media*, 41 HOUSTON L. REV.
1091, 1128-35 (2004), which contains an exhaustive review of the various homestead
proposals and a perceptive analysis of the reaction to them in the press.

The debate culminated in 2005.  During the debate on S.256, the bill that became
the 2005 amendments, Representative James Sensenbrenner, Republican of Wisconsin,
assured the House that the bill closed the "'millionaire's mansion' loophole in the current
bankruptcy code that permits corporate criminals to shield their multi-million dollar
homesteads." 151 CONG. REC. H2048 (daily ed. April 14, 2005).  In the Senate, Tom
Carper, Democrat of Delaware, told his colleagues: "[U]nder current law, a wealthy
individual in a State such as Florida or Texas can go out, if they are a millionaire, and take
those millions of dollars and invest that money in real estate, a huge house, property, and
land in the State, file for bankruptcy, and basically protect all of their assets. . . . With the

---

estate. But that acre included a five-bedroom, six-and-a-half-bath mansion with two
studies, a pool and a guest house.
 Or the movie actor, Burt Reynolds, who declared bankruptcy in 1996,
claiming more than $10 million in debt. Reynolds kept a $2.5 million home –
appropriately named 'Valhalla' – while his creditors received 20 cents on the dollar.
 The situation in Florida has become so notorious that one Miami bankruptcy
judge told the New York Times, 'You could shelter the Taj Mahal in this state and
no one could do anything about it.'
 This is a national problem that demands a uniform solution. . . . [D]ebtors
who live in the 45 states that cap the exemption [. . .] are free to relocate to one of
the five so-called 'debtors' paradises' that have no cap at all."
H.R. REP. NO. 106-123, at 378-79 (1999) (additional dissenting views of several members)
(footnotes omitted).  *See also* H.R. REP. NO. 108-40 (pt. I), at 131 (2003); H.R. REP. NO. 107-3 (pt.
I), at 488-91 (2001) (additional dissenting views of several members) (footnotes omitted); S. REP.
NO. 106-49, at 76 (1999) (additional views of Sen. Kohl); S. REP. NO. 105-253, at 46 (1998).
 Indeed, Senators Kohl and Sessions requested and received a report from the General
Accounting Office on the effect of unlimited homesteads.  *See* GEN. ACCOUNTING OFFICE, Pub.
No. GAO/GGD-99- 118R, *Bankruptcy Reform: Use of the Homestead Exemption by Chapter 7
Bankruptcy Debtors in the Northern District of Texas and the Southern District of Florida in 1998*
(1999), *reprinted at* http://www.gao.gov/archive/1999/gg99118r.pdf.

legislation we have before us, someone has to figure out that 2 ½ years ahead of time people are going to want to file for bankruptcy and be smart enough to put the money into a home . . ." *Id.* at S2415-16 (daily ed. March 10, 2005). These statements on the floor of both chambers were echoed in the House Report on S.256, which flatly stated that: "The bill . . . restricts the so-called 'mansion loophole' . . . by requiring a debtor to own the homestead for at least 40 months [1,215 days] before he or she can use state exemption law; current law imposes no such requirement." H.R. Rep. No. 109-031 at 15-16 (2005).[12]  *See also* Margaret Howard, *Exemptions Under the 2005 Bankruptcy Amendments: A Tale of Opportunity Lost*, 79 Am. Bankr. L.J. 397, 402-06 (2005).

But as Section 522(p) is written and as it was enacted, the "result of electing" language effectively makes it applicable to debtors in only four states (Texas, Massachusetts, Minnesota, and Rhode Island) and the District of Columbia. These are the only jurisdictions that allow debtors to choose between state and federal exemptions and that have homestead exemptions higher than the $125,000 federal cap.[13]  However, given

---

[12]In the House, Representative Sensenbrenner placed a "Summary of Principal Provisions" of the S. 256 into the record. It said the bill

> [c]loses the 'mansion loophole' for greedy corporate culprits: Under current bankruptcy law, debtors living in certain states can shield from their creditors virtually all of the equity in their homes. In light of this, some debtors actually move to these states just to take advantage of their 'mansion loophole' laws. S. 256 closes this loophole for abuse by requiring a debtor to reside in the state for at least 2 years . . . [and] . . . to own the homestead for at least 40 months before he or she can use state exemption law.

151 Cong. Rec. H2049 (daily ed. April 14, 2005).

[13]The homestead exemption in the District of Columbia is unlimited (D.C. Code Ann. § 15-501(a)(14), and in Texas, the dollar amount is unlimited (Tex. Const. art. 15, § 51). In Massachusetts, the homestead exemption is $500,000 (Mass. Ann. Laws 188, §§ 1 and 1A), and in Minnesota and Rhode Island it is $200,000 (Minn. Stat. ch. 510.02 and R.I. Gen. Laws § 9-26-4.1). *See, e.g., In re* Maronde, 332 B.R. 593, 597-98 (Bankr. D. Minn. 2005) (describing the Minnesota homestead exemption).

1  the history recounted above, it is inconceivable that Congress intended such a limited result,

2  and it is demonstrably not what members of Congress thought they were implementing

3  when they voted for the bill.

4         In the first place, as noted above, legislators were repeatedly assured that the bill

5  closed the mansion loophole, which many of them said they wanted to do.  In the second

6  place, there is no discernible or feasible public policy that is served by (or was discussed)

7  linking the $125,000 cap to a debtor's choosing between state and federal exemptions.

8  Whether a debtor elects exemptions or gets them by default is completely unrelated to the

9  problem that Congress was trying to solve – a debtor's ability to shield assets by buying a

10 homestead in a state with an unlimited exemption.  As written, Section 522(p) would not

11 seem to cover Florida, where many of the mansion loophole abuses are alleged to have

12 occurred, while it does cover Massachusetts, Minnesota, Rhode Island, none of which have

13 unlimited exemptions, and the District of Columbia, which does.  None of these

14 jurisdictions is known to have attracted mansion abusers.

15        Under the circumstances, this court has no doubt that the "result of electing"

16 requirement in Section 522(p) is a mistake in drafting the text of the statute.  Application of

17 the plain meaning of the word "electing" in Section 522(p) would restrict the homestead

18 exemption cap to states in which debtors actually make an election between federal and

19

20        The appendix to this opinion contains a table of the current homestead exemptions for each

21 state whose homestead exemption is greater than $125,000, along with each state's status as "opt-
   in" (the debtor has a choice) or "opt-out" (the debtor has no choice). It shows that there are five

22 opt-in jurisdictions that have homestead exemptions greater than the $125,000 cap. In addition,
   there are only eight opt-out states where the homestead exemption, the only homestead the debtor

23 may claim, is greater than $125,000. Thus, if Section 522(p) is read literally, it affects only four
   states and the District of Columbia.  As set forth later in this opinion, there is no policy reason why

24 Congress should distinguish between debtors in those five jurisdictions and debtors in the rest of
   the country.

25

state homestead exemptions; that is, when debtors actually have a choice between the homestead exemption provided in Section 522(d)(1) and the homestead exemption (if any) provided by their home state. The drafters no doubt used the word "electing" without realizing that it made any difference. In fact it makes a big difference: In states that require debtors to use the state exemptions, including Nevada and Florida, no election is made, and thus plain meaning would dictate that the $125,000 cap would never be triggered. The mansion loophole would thus remain wide open. So the text as written, if applied strictly and literally, yields a bizarre result that would seem to effectively thwart Congress's stated intent.

In addition, the literal text would seem to make a distinction between Texas, an opt-in state where the debtor can choose between state and federal exemptions, and Florida, an opt-out state where the debtor has no choice. As both Texas and Florida have been cited as states where wealthy debtors have used the mansion loophole, there is no imaginable reason for making this distinction and treating the two states differently. *See also* note 21 *infra.*

### Scrivener's Error

But if the word "electing" is a drafting mistake, does it fall under the "scrivener's error" doctrine that would allow this court to correct it? Or can only Congress correct its drafting mistakes, particularly when the resulting wording of the statute is clear and unambiguous, however perverse the result?[14]

---

[14]This debate is strictly about noncriminal statutes. Different rules of interpretation, as well as the rule of lenity, apply for apparent drafting errors in criminal statutes. *See, e.g.*, United States v. Moore, 136 F.3d 1343 (9th Cir. 1998) (criminal statute did not prohibit defendant's conduct, even though it was likely intended to do so, due to mistaken cross-reference in the statute's definitions).

11

The problem of when, how, and even whether a court can correct a legislature's mistake in drafting a law – that is, when the legislature intends one thing but inadvertently drafts and enacts another – goes back to the earliest cases in this country's legal history,[15] and it has been an ongoing subject of discussion and debate.[16]  A key problem is that when a court decides to ignore the clear words and plain meaning of a statute, there is always a danger that what it thinks is a drafting mistake actually represents a substantive decision by the legislature, perhaps the result of an unseen legislative compromise.  In that case, rather than helpfully correcting a mistake, the court might be improperly rewriting the law.  If the court is mistaken and the words of the statute are indeed what the legislature intended, then when the court substitutes what it thinks the legislature meant for what the statute says, it abandons its proper role as the legislature's agent and, not incidentally, violates the separation of powers that is basic to our constitutional structure.

As a result, there is a strong and longstanding view that the words of a statute are supreme and, if they are clear, they should be taken as fully embodying what the legislature intended. If the text is not ambiguous, that is the end of the inquiry.  As no less than Oliver Wendell Holmes, Jr. wrote more than 100 years ago, "[W]e do not inquire what the legislature meant; we ask only what the statute means." Oliver Wendell Holmes, Jr., *The*

---

[15]*See, e.g.*, Huidekoper's Lessee v. Douglas, 7 U.S. (3 Cranch) 1 (1805), in which the Supreme Court concluded that the word "residing" in a Pennsylvania statute resulted in an "absurdity," and concluded, "It is clear that they [the legislature] do not mean what they say, and the question is, what did they mean to say?" *Id.* at 58. The court changed "residing" to "shall reside" to straighten things out. *Id.*

[16]The literature on this subject is enormous, to say the least. *See* WILLIAM D. POPKIN, STATUTES IN COURT: THE HISTORY AND THEORY OF STATUTORY INTERPRETATION (1999). Particularly helpful in analyzing the current case were Jonathan R. Seigel, *What Statutory Drafting Errors Teach Us About Statutory Interpretation*, 69 GEO. WASH. L. REV. 309 (2001) and Michael S. Fried, *A Theory of Scrivener's Error*, 52 RUTGERS L. REV. 589 (2000).

1    *Theory of Legal Interpretation*, 12 HARV. L. REV. 417, 419 (1899).

2    But that is not the end of the matter.  Even the strictest textualists concede that

3    sometimes a drafting error is so obvious that a court properly acts as the legislature's agent

4    by fixing it.  As the Supreme Court has told us: "The plain meaning of legislation should be

5    conclusive, except in the 'rare cases [in which] the literal application of a statute will

6    produce a result demonstrably at odds with the intentions of its drafters.' In such cases, the

7    intention of the drafters, rather than the strict language, controls." United States v. Ron Pair

8    Enters., 489 U.S. 235, 242 (1989), *quoting* Griffen v. Oceanic Contractors, Inc., 458 U.S.

9    564, 571 (1982).  More recently, the Ninth Circuit, while asserting that "legislative history

10   is irrelevant to the interpretation of an unambiguous statute," said that a court may  "depart

11   from this rule, if at all, only where the legislative history clearly indicates that Congress

12   meant something other than what it said." Perlman v. Catapult Entm't, Inc. (*In re* Catapult

13   Entm't, Inc.), 165 F.3d 747, 753 n. 9 (9th Cir. 1999).

14   But acknowledging that it may sometimes be necessary for a court to reform a

15   statute in order to implement the intent of the legislature does not answer the question of

16   when and under what circumstances such reformation is proper.  How can a court be sure

17   that the text is not what the legislature meant?

18   Courts find it easiest to reform a statute when the suspect text makes no sense

19   whatever.[17]  It is somewhat harder when the text makes literal sense but it is absurd, or

20

21

22

23   [17]*See, e.g.*, U.S. v. Pabon-Cruz, 391 F.3d 86 (2d Cir. 2004) (the statute said that "[a]ny
individual who violates . . . this section, shall be fined under this title or imprisoned not less than
24   10 years nor more than 20 years, *and* both . . . ") (italics added). The court looked to the legislative
history to determine what Congress had intended.
25

when applying it would lead to an absurd result.[18]  It is hardest to do when, as in the current case, the text makes sense but yields a perverse result.  The more substantive the change, the more wary a court must be about making it.  As the Supreme Court has said, "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning."  Union Bank v. Wolas, 502 U.S. 151, 158 (1991).

All statutory construction begins, of course, "with the language of the statute itself."  United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989).  In construing this language, we assume that "Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'"  Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship, 507 U.S. 380, 388 (1993) (quoting Perrin v. United States, 444 U.S. 37, 42 (1979)).  In the current case, the plain meaning of Section 522(p) is clear, but it is demonstrable that Congress intended to close the mansion loophole even in opt-out states where the debtor has no choice between state and federal exemptions.  It certainly did not intend to leave the loophole wide open in opt-out states.

### The Plain Meaning of Section 522(p) and Justice Scalia's Test

But how can a court be sure that Congress did not mean what it enacted?  Justice Antonin Scalia is one of the strictest, if not the strictest, textualists active today.  Studying his methods of statutory interpretation has a payoff for a trial court.  If the methods used by Justice Scalia would lead to the reformation of the statute, then the statute probably should be reformed, and little time need be spent in discerning the proper or ultimate test for all

---

[18]A 1934 Louisiana law said litigants could impeach the testimony of the other side's witnesses "in any unlawful way," which was clear but absurd. The State Supreme Court held that the prefix "un" was an accident and that the legislature had meant "in any lawful way," and that's the way it construed it. Scurto v. LeBlanc, 191 La. 136, 156, 184 So. 567, 574 (1938).

1    federal statutes.[19]

2    Not surprisingly, Justice Scalia's jurisprudence on this point intentionally makes

3    it very difficult for a court to revise a statute's written text or to interpret it contrary to its

4    plain meaning.  Very difficult, perhaps, but not impossible.  Even Justice Scalia has

5    acknowledged that a court can correct a scrivener's error, which he defines as a case "where

6    on the very face of the statute it is clear to the reader that a mistake of expression (rather

7    than of legislative wisdom) has been made."[20]

8    In his opinions, Justice Scalia has occasionally set out the high standard that, in

9    his view, a court must meet before it may substitute legislative intent for legislative

10    enactment.  In brief, he requires that two conditions be met before such variance is

11    permissible.  First, the plain meaning of the statute under consideration must lack any

12    rational purpose – not just what Congress may have intended, but any plausible

13    congressional purpose.  In Holloway v. United States, for example, Justice Scalia disagreed

14    with the majority's willingness to reform an otherwise unambiguous statute because he

15    found a "plausible congressional purpose in enacting this language – not what I necessarily

16    think was the real one."  Holloway v. United States, 526 U.S. 1, 19 n.2 (Scalia, J.,

17    dissenting) (1999).  Further, he acknowledged, "I search for a plausible purpose because a

18    
19    [19]As Justice Scalia himself has noted, the Supreme Court has not given unambiguous instructions on how to detect or treat legislative ambiguity.  As he lamented in a dissent issued in
20    1992: "I have the greatest sympathy," he wrote, "for the Court of Appeals who must predict which manner of statutory construction we shall use for the next Bankruptcy Code case."   Dewsnup v.
21    Timm, 502 U.S. 410, 436 (1992) (Scalia, J., dissenting).  One would hope that this sympathy extends to bankruptcy courts as well.  *See also* Lee Dembart & Bruce A. Markell, *Alive at 25? A*
22    *Short Review of the Supreme Court's Bankruptcy Jurisprudence, 1979-2004*, 78 AM. BANKR. L.J.
23    373, 386-93 (2004).

24    [20]Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of the United States Federal Courts in Interpreting the Constitution and the Laws*, in A MATTER OF
25    INTERPRETATION: FEDERAL COURTS AND THE LAW 3, 20 (Amy Gutmann ed., 1997).

15

text without one may represent a 'scrivener's error' that we may properly correct." *Id.* So, according to Justice Scalia, if there is no plausible congressional purpose in the text as written, the statute is a candidate for reformation.

But there must be more. A second element for Justice Scalia is that the intended meaning to be used must be obvious. "The *sine qua non* of any 'scrivener's error' doctrine, it seems to me, is that the meaning genuinely intended but inadequately expressed must be absolutely clear," he wrote. "[O]therwise we might be rewriting the statute rather than correcting a technical mistake." United States v. X-Citement Video, Inc., 513 U.S. 64, 82 (Scalia, J., dissenting) (1994).

Applying these tests, Justice Scalia has occasionally been willing to override the plain meaning of a text before him, as he was in Green v. Bock Laundry Mach. Co., 490 U.S. 504 (1989). In that product-liability case, Green sued Bock, which had manufactured a machine that injured him. At trial, Bock impeached Green's testimony by introducing evidence that he had previously been convicted of burglary and a related felony.

Green lost. He then appealed, arguing that the trial court had allowed the impeachment evidence to be admitted without weighing its probative value against its prejudicial effect. He cited Federal Rule of Evidence 609(a)(1), which specified that evidence that a witness had been convicted of a felony "shall" be admitted for the purpose of attacking the credibility of the witness "only if" the court determined that the probativeness of the evidence outweighed its prejudice "to the defendant."

Did this rule apply in a civil case? The plain language of the rule appeared to establish a different standard for admitting impeachment evidence against a civil defendant than against a civil plaintiff, such as Green. It seemed to require a court to weigh the prejudicial effect of a witness's testimony to a civil defendant but to allow the automatic

16

1   admissibility of evidence of prior felony convictions detrimental to a civil plaintiff.

2         In a concurring opinion, Justice Scalia wrote:

3             We are confronted here with a statute which, if interpreted literally, produces an absurd, and perhaps unconstitutional, result. Our

4         task is to give some alternative meaning to the word "defendant" in Federal Rule of Evidence 609(a)(1) that avoids this consequence; and

5         then to determine whether Rule 609(a)(1) excludes the operation of Federal Rule of Evidence 403 [which requires the weighing].

6             I think it entirely appropriate to consult all public materials, including the background of Rule 609(a)(1) and the legislative history

7         of its adoption, to verify that what seems to us an unthinkable disposition (civil defendants but not civil plaintiffs receive the benefit

8         of weighing prejudice) was indeed unthought of, and thus to justify a departure from the ordinary meaning of the word "defendant" in the

9         Rule.

10   490 U.S. at 527.

11         As a result, Justice Scalia read the word "defendant" to mean "criminal

12   defendant." *Id.* at 529. This variance from the plain meaning was justified because it met

13   both of his requirements: The text as written had no plausible policy purpose – in fact, it

14   may have been unconstitutional – and the correct meaning was absolutely clear from the

15   legislative history.

16                         **Conclusion**

17         In the view of this court, the text of Section 522(p) meets both of Justice Scalia's

18   requirements for correction. There is no plausible purpose in linking the 1,215-day

19   ownership requirement to a debtor's choosing between state and federal exemptions, and

20   there is not a shred of evidence in the extensive legislative history going back to 1997 that

21   the mansion loophole was in any way connected to a debtor's choice of exemptions.

22   Further, it is obvious that Congress intended to close the mansion loophole in opt-in states

23   as well as opt-out states. But the drafters of the legislation inartfully, unthinkingly, and, as

24   it turned out, incorrectly expressed that intention by using the word "electing." They should

25

have said, "If there is a state homestead exemption, . . . ."  Unfortunately,  they expressed

that idea as, "[A]s a result of electing . . . to exempt property under State or local law."  All

the evidence indicates that they believed – erroneously – that the two expressions were

equivalent, which they are not.

This court is, of course, reluctant to say that although Congress enacted X it

actually meant Y, and it does not do so lightly.  But in this case, the scrivener's error is

obvious from the extensive record and from common sense:  The intent of Congress is

crystal clear, and there is no feasible rationale or policy for enacting what the text of the

statute says.  Indeed, strictly applying the words of Section 522(p) would actually prevent

Congress's goal from being achieved.[21]  So it is proper to give the statute the meaning that

Congress undeniably intended.

---

[21]An argument might be made that the "electing" language was part of an unexpressed compromise, in which Congress limited the homestead for the residents of some states but not others.  That argument is weak to begin with – it is difficult to believe that anything was unexpressed with respect to the limitation on homesteads – but more to the point is the impact of limiting the statute only to states that allow their residents to choose the exemptions in Section 522(d).  As shown in the appendix, that would limit Texas homesteads but not Florida homesteads, since Florida is an opt-out state, but Texas is not.  Given the vociferousness of Texan opposition to any limitation on the homestead, this rules out giving Section 522(p) its so-called plain meaning because its language was the result of a silent compromise.  *See, e.g.*, 145 Cong. Rec. S14,481 (1999) (statement of Sen. Kay Bailey Hutchison, Republican of Texas, arguing that states should not be bound by a "one-size-fits-all" federal approach, but instead should be able to opt out of any exemption cap); Tom Hamburger, *Senate Approves Bankruptcy Legislation Provision Capping Exemption on Home Equity May Lead to Battle with Bush, House*, Wall St. J., Mar. 16, 2001, at A3 (quoting Senator Hutchison as vowing to "do everything I can to fix this in conference . . . or unfortunately I am going to have to try and kill the bill" (alteration in original)); Press Release, *Senator Hutchison Vows Continued Effort to Preserve Texas' Homestead Exemption: Will Work with Conference on Final Bankruptcy Legislation*, at http:// hutchison.senate.gov/prl201.htm (Feb. 2, 2000) ("It is wrong to pre-empt 130 years of American history – and the rights of every state – to go after a handful of bad actors. This is the classic government attempt to impose a one-size-fits-all solution.").  All of these quotations are reprinted from Jacoby, *supra*, at 1138 n.208.

1    The trustee's objection is sustained, and the Kanes' homestead exemption is

2  limited to $125,000.[22]  A separate order pursuant to Bankruptcy Rule 9021 will be entered.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
_____

22    [22]Given this disposition, it is unnecessary to decide the claims that equity due to

23  appreciation accrued during the 1,215-day period preceding the commencement of the case, as well
    as equity attributable to the principal portion of any mortgage payments made during that same

24  time, are subject to the cap regardless of the period of debtor's residency.  *See In re* Blair, 334 B.R.
    374 (Bankr. N.D. Tex. 2005).  There is simply no evidence of any appreciation (or, for that matter,

25  any payments) within the short period that debtors have been Nevada residents.

**Appendix**

States With Homestead Exemptions Greater Than $125,000[23]

| Jurisdiction | Opt-In? | Homestead dollar limit | Citation |
|---|---|---|---|

**States where a debtor makes an election between state and federal exemptions:**

| Jurisdiction | Opt-In? | Homestead dollar limit | Citation |
|---|---|---|---|
| D.C. | Yes | Unlimited | D.C. Code Ann. § 15-501(a)(14) |
| Texas | Yes | Unlimited | Tex. Const. art. 16, §§ 50 and 51, and Tex. Prop. Code §§ 41.001 and 41.002 |
| Massachusetts | Yes | $500,000 | Mass. Ann. Laws ch 188, §§ 1 and 1A |
| Minnesota | Yes | $200,000 | Minn. Stat. §§ 510.02 |
| Rhode Island | Yes | $200,000 | R.I. Gen. Laws § 9-26-4.1 |

**States where a debtor has no choice and must use the state exemption:**

| Jurisdiction | Opt-In? | Homestead dollar limit | Citation |
|---|---|---|---|
| Florida | No | Unlimited | Fla. Const art. 10, § 4, and Fla. Stat. Ann. § 222.01 |
| Iowa | No | Unlimited | Iowa Code Ann. § 561.16 |
| Kansas | No | Unlimited | Kan. Stat. Ann § 60-2301 |
| Oklahoma | No | Unlimited | Okla. Stat. Title 31, § 1.A.1 |
| Nevada | No | $350,000 | Nev. Rev. Stat. §§ 115.010.2 and 21.090.1(*l*) |
| Arizona | No | $150,000 | Ariz. Rev. Stat. 33-1101 |

---

[23]This table is limited to states whose homestead exemptions are greater than $125,000, because that is the limit under Section 522(p).  In addition, compiling a table of homestead exemptions for all states is complicated by the fact that there is no uniformity of approach to exemptions. For example, Delaware has no explicit homestead exemption, but debtors in Delaware may exempt "property having an aggregate fair market value of not more than $25,000." DEL. CODE ANN., tit. 10 § 4914(b). So a debtor in Delaware could arguably exempt only $25,000 of a homestead, or, as some have read, exempt no homestead at all.  Further, some states create categories of homestead exemptions, and some of those categories may permit exemptions of more than $125,000.  *See, e.g.* CAL. CODE CIV. PRO. 704.730(a)(3) (homestead of $150,000 provided for disabled debtors, debtors over the age of 65, and debtors whose gross annual income is less than $15,000).  We do not list those states here.

20

Copies sent to:

David J. Winterton
david@davidwinterton.com diane@davidwinterton.com

Marc Andrews
21680 Gateway Center Drive #280
Diamond Bar, CA  91765

Don E. Lanson
16000 Ventura Blvd., Suite 1000
Encino, CA 91436

Steven A. Schuman
Leonard Dicker & Schreiber
9430 Olympic Boulevard, Suite 400
Beverly Hills, CA 90212

James F. Lisowski, Sr.
P.O. Box 95695
Las Vegas, NV 89193

Trustee U.S. Trustee - Lv - 7
300 Las Vegas Boulevard S.
Suite 4300
Las Vegas, NV 89101

# # #

21